COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-07-386-CV

 

 

IN
THE INTEREST OF Z.D., A CHILD

 

 

 

                                              ------------

 

           FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








Tamica D. appeals from the
trial court=s order
terminating the parent-child relationship between her and her daughter,
Z.D.  In four issues, Tamica contends
that (1, 2) the evidence is legally and factually insufficient to prove that
she had her parental rights terminated as to another child and that she
voluntarily, deliberately, or consciously engaged in conduct that endangered
Z.D., (3) the evidence is factually insufficient to support the trial court=s best interest finding, and (4) she received ineffective assistance
of counsel.  We affirm.  

Factual Background

Z.D. was born on December 11,
2006.  On December 13, 2006, the
Department of Family and Protective Services (ADepartment@) took Z.D.
into custody because of the risk of neglectful supervision.  The Department stated that it had reason to
believe that Z.D. was at risk Abased on [Tamica=s] history
and lack of current stability.@  On December 14, 2006, the
Department filed its petition to terminate Tamica=s parental rights with regard to Z.D.    

Tamica has four older
children, C.D., B.D., A.W., and C.W., to whom she has given up custody,
although her parental rights to the children have never been terminated.  Tamica gave C.D., who was born on March 20,
1996, up for adoption to his godparents after she was sent to prison for the
offense of manufacture and delivery of a controlled substance.  She then gave B.D., who was born on August 6,
2000, to the Flynns, her mother and step-father, because she was heavily
involved in drugs and could not adequately care for her.  In regards to A.W. and C.W., born on February
7, 2003, and January 20, 2004, respectively, the Department removed them after
allegations of medical neglect regarding A.W. 
At the time of trial, A.W. and C.W. were living with paternal relatives
in Michigan.   








Tamica acknowledged that she
has had a drug problem since 1996 when C.D. was born.  On December 27, 2006, a hair-follicle test to
which Tamica submitted came back positive for cocaine.  Additionally, in July 2007, Tamica tested
positive for cocaine and ecstasy.  Tamica
denied using cocaine and explained that it was in her system because ecstasy is
cocaine based.   

As part of her service plan,
Tamica was required to attend drug assessment and treatment.  However, Tamica did not check into Pine
Street, a drug treatment facility, until July 2007, which was after she tested
positive for cocaine and ecstasy.  At the
time of trial, Tamica had completed ten days in detox and thirty-eight days at
a drug treatment program and was 120 days clean. 








Tamica stated that she
completed all of the requirements of her service plan except for the
psychological testing because she did not have a copy of the service plan.  Tamica acknowledged that she received a copy
of the service plan on February 23, 2007. 
However, she stated that she received a second copy of the service plan
at the end of March because Jennifer Graves, her then Department caseworker,
told her that her supervisor had not signed the copy that had originally been
sent.  Tamica stated that after she was
sent to jail for assaulting her step-father, Mr. Flynn, she lost her apartment
and everything was thrown away, including her copy of the service plan.  Tamica stated that she received a third copy
of the service plan in June, after Pam Gillinger had taken over as her
caseworker.    

Tamica testified that after
she got out of jail, she went to work as an exotic dancer at the T&A Club
and then at Illusions.  She stated that
neither job gave her pay stubs to submit to the Department because although she
receives W2 forms at the end of the year, she gets paid in cash during the
year.   

Tamica stated that after Z.D.
was born, she was allowed weekly visits with Z.D.  However, Tamica acknowledged that she only
visited Z.D. once in January and once in February.  Tamica testified that she did not get to
visit with Z.D. as often as she was supposed to because Ahalf the time@ the Flynns,
who had custody of Z.D., or the Department would not show up for the scheduled
visitation.  Tamica said there were
occasions that she could not make the visitation, but that she always called
the Department or the Flynns to let them know that she was not going to be able
to make the visitation.  She also stated
that there were Aseveral
times@ that she cut the visitation short because Z.D. was not feeling
well.   








Further, Tamica changed
residences frequently between Z.D.=s birth and the termination trial. 
Tamica was living at the Union Gospel Mission, a homeless shelter in
Fort Worth, when Z.D. was born.  In
mid-January 2007, after being asked to leave Union Gospel Mission because she
was in the family center and she did not have custody of Z.D., Tamica went to a
women=s shelter.  In February 2007,
Tamica moved into a duplex.  Then in
March 2007, Tamica moved into an efficiency apartment.  Later that month, Tamica went to jail for an
assault that occurred in 2005 against Mr. Flynn.  When she got out of jail in late March,
Tamica moved in with an unnamed friend. 
Tamica then moved into a Days Inn motel and then moved to a Motel
6.  Finally, from mid-July 2007 to the
time of trial, Tamica was living at Pine Street.   

At trial, Tamica testified
that she had been using drugs since 1996. 
She admitted that she would disappear and not contact the Flynns, who
were caring for her daughter, B.D., for long periods of time.  Tamica stated that she has been diagnosed
with bipolar disorder and manic depression. 
She further stated that she had not been taking her bipolar-disorder
medication consistently over the years, but that she began taking it on a
regular basis in August 2007.   








Graves, the Department
caseworker who handled Z.D.=s case from December 2006 until June 2007, testified that she first
met Tamica in December 2006 during the first show cause hearing.  Graves stated that in the first five months
after Z.D. was removed, Tamica only saw Z.D. five times. Graves did state,
however, that there was one visit that had to be cut short because B.D. was
sick at school and needed to be picked up, another visit that was cancelled by
Mrs. Flynn because there was a miscommunication about the time, and a third
visit that was cancelled because there was a miscommunication on the part of
the Department.  Graves testified that
Tamica had a two-hour visit with Z.D. on January 11, 2007, and that she did not
have any visits with Z.D. in February. 

Graves said that during the
time that she was Z.D.=s
caseworker, Tamica did not attend any parenting courses; did not complete a
drug assessment, psychological assessment, or individual therapy; did not
establish safe, stable, and appropriate housing; and did not provide evidence
of a stable job, all of which were required under the service plan.  

Gillinger, the Department
caseworker who handled Z.D.=s case from June 2007 until the time of trial, testified that she
first made contact with Tamica in early July. 
She stated that Tamica told her that she had not received a service plan
and so she brought Tamica a copy on August 8. 









Gillinger stated that the first
report the Department received regarding Tamica was on June 21, 1996, involving
C.D.  She stated that the allegation was
neglectful supervision.  She also stated
that there was a referral on February 14, 2001, of physical neglect regarding
B.D.  Gillinger stated that it was
determined that Tamica was leaving B.D. in unstable environments, neglecting
parenting for days, weeks, and even months at a time, and leaving B.D. with
people that she did not know.  Additionally,
on March 27, 2003, the Department received a referral of medical neglect
regarding A.W.   

Gillinger testified that in
July 2007, after Tamica tested positive for cocaine and ecstasy, Tamica was
concerned that her probation[2]
was going to be revoked.  She stated that
Tamica entered drug treatment a week or two after the positive drug test.  Additionally, Gillinger stated that Tamica
does seem to care for Z.D. and love her. 
She also stated that the Flynns love and have bonded with Z.D.   

Mr. Flynn testified that Z.D.
was officially placed with him and his wife on December 29, 2006.  Mr. Flynn stated that while caring for Z.D.,
he has been disappointed with the Department=s failure to return phone calls. 
He said that when Z.D. had to go to the hospital while she was in their
care, he had to contact the attorney ad litem because the Department caseworker
was out of town.  He also said that he
has not been well informed of the court hearings. 








Mr. Flynn stated that he has
a Afairly good relationship@ with Tamica except when she does not take her medication.  He said that Tamica can be a Avery violent person when she [is] not taking her medication.@  He stated that he has known
Tamica since she was eighteen years old and Agot out of prison.@  Mr. Flynn said that he
considers Tamica to be his daughter.  Mr.
Flynn testified, however, that Tamica does not have a relationship with her
mother.   

Mr. Flynn further stated that
he considers Z.D. to be part of the family. He stated that Z.D. calls him ADa-da@ and that
she calls B.D. ASissy.@  Mr. Flynn also stated that
Z.D. is attached to Mrs. Flynn.  Mr.
Flynn testified that when Z.D. first came to their home, she was underweight
and Afrail.@   

Additionally, Mr. Flynn
testified that when B.D. was born, Tamica was having drug and mental
problems.  He stated that in the few
months after B.D. was born, he and his wife were caring for B.D. because Tamica
would leave the house and be gone for two or three days at a time.  He stated that on one occasion, Tamica took
B.D. and walked to a bus stop when it was fifty-five degrees outside and
raining.  He said that B.D. was only
wearing pajamas and was wrapped in a blanket and that Tamica did not have an
umbrella.  He stated that five or six
weeks later he and his wife obtained custody of B.D.  

He further stated that Z.D.
would possibly be safe in Tamica=s care while she was in the program, but that when she is discharged
from the program he Awould [not]
be able to sleep nights.@  Mr. Flynn explained that all of Tamica=s boyfriends have assaulted her and that if they do that to someone
they supposedly love, he would be concerned with what would happen when Z.D.
started crying in the middle of the night.  









Mr. Flynn testified that he
believed it would be in Z.D.=s best interest to terminate Tamica=s parental rights.  He stated
that Tamica does not have stability in her life.  Mr. Flynn further said that when Tamica was
living two homes down from him and his wife while they had custody of B.D.,
Tamica never came down to visit with B.D. 
He also stated that Tamica has never sent letters, Christmas cards, or
birthday cards to B.D. nor gone to any school functions for B.D.   

Finally, Mr. Flynn stated
that he had a discussion with Tamica regarding why she went to Pine
Street.  He stated that Tamica told him
that she had failed a drug test and was afraid that her probation was going to
be revoked and she would go to jail. 
Tamica also told Mr. Flynn that she needed to have custody of Z.D. to
remain in the program.  

Procedural History








The Department filed its
petition for termination on December 14, 2006. 
As grounds for termination, the Department alleged that Tamica (1)
knowingly placed or allowed Z.D. to remain in conditions that endangered the
physical or emotional well-being of Z.D.; (2) knowingly placed Z.D. with
persons who engaged in conduct which endangers the physical or emotional
well-being of Z.D.; (3) executed an unrevoked or irrevocable affidavit of
relinquishment of parental rights as provided by chapter 161, Texas Family Code;
(4) constructively abandoned Z.D. while she was in the Department=s conservatorship; (5) knowingly engaged in criminal conduct that
resulted in Tamica=s
conviction; and (6) had her parent-child relationship terminated with respect
to another child. 

After a bench trial, the
trial court found that Tamica knowingly placed or knowingly allowed Z.D. to
remain in conditions or surroundings which endangered the physical or emotional
well-being of Z.D., engaged in conduct or knowingly placed Z.D. with persons
who engaged in conduct which endangered the physical or emotional well-being of
Z.D., and had her parent-child relationship terminated with respect to another
child based on a finding that Tamica=s conduct violationed section 161.001(1)(D) or (E) of the Texas Family
Code or a substantially equivalent provision of another state.  The trial court further found that
termination was in Z.D.=s best
interest.  The trial court terminated
Tamica=s parental rights and appointed the Department as Z.D.=s permanent managing conservator. 
Tamica filed a motion for new trial, which the trial court denied after
a hearing.

Discussion








In her first, second, and
third issues, Tamica argues that the evidence is legally and factually
insufficient to support the trial court=s judgment under section 161.001(1)(D), (E), and (M) of the family
code and that the evidence is factually insufficient to support the trial court=s best interest finding.  See
Tex. Fam. Code Ann. ' 161.001(1)(D),
(E), (M), (2) (Vernon 2007).

A. 
Legal and Factual Sufficiency

a.  Standards of Review

A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758B59, 102 S.
Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003). AWhile parental rights are of constitutional magnitude, they are not
absolute.  Just as it is imperative for
courts to recognize the constitutional underpinnings of the parent-child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@  C.H., 89 S.W.3d at
26.  In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child=s right to inherit. Tex. Fam. Code Ann. ' 161.206(b) (Vernon Supp. 2008); Holick v. Smith, 685 S.W.2d
18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20B21; In re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort Worth 2007, no pet.).








In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  Tex. Fam. Code Ann. ' 161.001 (Vernon Supp. 2008); In re J.L., 163 S.W.3d 79,
84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact. 
Tex. Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).

Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  Tex. Fam. Code Ann. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002).  This intermediate standard
falls between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex. Fam. Code Ann. ' 101.007 (Vernon 2002).








In reviewing the evidence for
legal sufficiency in parental termination cases, we must determine whether the
evidence is such that a fact-finder could reasonably form a firm belief or conviction
that the grounds for termination were proven. 
In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the evidence in the light
most favorable to the finding and judgment. 
Id.  This means that we
must assume that the fact-finder resolved any disputed facts in favor of its
finding if a reasonable fact-finder could have done so.  Id. 
We must also disregard all evidence that a reasonable fact-finder could
have disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable fact-finder could
and disregard contrary evidence unless a reasonable fact-finder could not.  Id.

We must therefore consider
all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id. at 573.








In reviewing the evidence for
factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a fact-finder could reasonably form a firm conviction or
belief that the parent violated section 161.001(1)(D), (E), and (M) and that
the termination of the parent=s parental rights would be in the best interest of the child.  In re C.H., 89 S.W.3d 17, 28 (Tex.
2002).  If, in light of the entire
record, the disputed evidence that a reasonable fact-finder could not have
credited in favor of the finding is so significant that a fact-finder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at 108. 
If we reverse on factual sufficiency grounds, then we must detail in our
opinion why we have concluded that a reasonable fact-finder could not have
credited disputed evidence in favor of its finding.  J.F.C., 96 S.W.3d at 266B67.

b.  Endangerment








Under section 161.001(1)(D),
the environment of a child must be examined to determine if it is a source of
endangerment to the child.  Id. ' 161.001(1)(D); In re D.T., 34 S.W.3d 625, 632 (Tex App.CFort Worth 2000, pet. denied). 
Under section 161.001(1)(E), the term Aendanger@ means to
expose to loss or injury, to jeopardize. 
Boyd, 727 S.W.2d at 533. Accordingly, when analyzing the trial
court=s findings under subsection (E), we must determine whether sufficient
evidence exists that the endangerment of the child=s physical well‑being was the direct result of the parent=s conduct, including acts, omissions, or failures to act.  In re D.M., 58 S.W.3d 801, 811B12 (Tex. App.CFort Worth
2001, no pet.). Termination under section 161.001(1)(E) must be based on more
than a single act or omission; a voluntary, deliberate, and conscious course of
conduct by the parent is required.  Tex.
Fam. Code Ann. ' 
161.001(1)(E); D.T., 34 S.W.3d at 634; In re K.M.M., 993 S.W.2d
225, 228 (Tex. App.CEastland
1999, no pet.). However, it is not necessary that the parent=s conduct be directed at the child or that the child actually suffer
injury. Boyd, 727 S.W.2d at 533. The specific danger to the child=s well‑being may be inferred from parental misconduct standing
alone. Id.

To determine whether
termination is necessary, courts may look to parental conduct both before and
after the child=s birth. D.M.,
58 S.W.3d at 812. As a general rule, conduct that subjects a child to a life of
uncertainty and instability endangers the physical and emotional well‑being
of a child.  In re S.D., 980
S.W.2d 758, 763 (Tex. App.CSan Antonio 1998, pet. denied).








A pattern of continued drug
use, including drug use during the pregnancy of another child and a parent=s failure to remain drug‑free while under the Department=s supervision, will support a finding of endangering conduct under section
161.001(1)(D) even if there is no direct evidence that the parent=s drug use actually injured the child.  Vasquez v. Tex. Dep=t of Protective & Regulatory Servs., 190 S.W.3d 189, 196 (Tex. App.CHouston [1st Dist.] 2005, pet. denied) (holding evidence legally and
factually sufficient to support endangering‑conduct finding when older
sibling of subject child tested positive for drugs at birth and parent
continued to use drugs after subject child=s birth and during pendency of Department=s involvement). A fact‑finder may reasonably infer from a parent=s failure to attend scheduled drug screenings that the parent was
avoiding testing because the parent was using drugs. In re W.E.C., 110
S.W.3d 231, 239 (Tex. App.CFort Worth 2003, no pet.). A parent=s engaging in illegal drug activity after agreeing not to do so in a
service plan for reunification with her children is sufficient to establish
clear and convincing proof of voluntary, deliberate, and conscious conduct that
endangered the well‑being of her children.  In re T.N., 180 S.W.3d 376, 383 (Tex.
App.CAmarillo 2005, no pet).

Here, Tamica admitted that
she used illegal drugs before Z.D. was born and that she continued to use them
until approximately August 13, 2007. Tamica stated that she gave up custody of
one of her children, B.D., because she was using drugs and did not complete
drug treatment.  Further, Tamica tested
positive for cocaine in December 2006, shortly after Z.D. was born, and cocaine
and ecstasy in July 2007.     








On the other hand, there is
no direct evidence that Tamica was using drugs while she was pregnant with
Z.D.  The record also shows that Tamica
began drug treatment in July 2007.  At
the time of trial, she had completed ten days in detox and thirty-eight days in
a drug treatment program. 

In addition to the evidence
concerning Tamica=s drug use,
the record shows that Tamica changed residences frequently without telling the
Department where she was, did not gain stable employment, and went to prison
for assault.  

We hold that the evidence is
legally and factually sufficient to support the trial court=s finding under section 161.001(1)(E). 
Because a finding of a violation of single paragraph of a section
161.001(1)Ccoupled with
a finding that termination is in the child=s best interestCwill support
a termination order, we need not consider Tamica=s argument that the evidence is legally and factually insufficient to
support the trial court=s finding
under sections  161.001(1)(D) and
(M).  See Tex. Fam. Code Ann. ' 161.001; Tex. R. App. P. 47.1. 
We overrule Tamica=s first and
second issues.  

c.  Z.D.=s Best Interest








Prompt and permanent
placement of the child in a safe environment is presumed to be in the child=s best interest .  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(1)    the desires of the child;

 

(2)    the emotional and physical needs of the child now and in the
future;

 

(3)    the emotional and physical danger to the child now and in the
future;

 

(4)    the parental abilities of the individuals seeking custody; 

 

(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home or proposed placement;

 

(8)    the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(9)    any excuse for the acts or
omissions of the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976). 








These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

(1) Z.D.=s desires.

Because Z.D. was less than a
year old at the time of trial, our review of the record finds no significant
evidence related to this factor.  

(2) Z.D.=s emotional and physical needs now and in the future.

Mr. Flynn testified that Z.D.
has a Alittle bit of a learning disability.@  He said that Z.D. is a Alittle delayed on her motor skills, crawling and everything.@ However, Mr. Flynn stated that Z.D. is in a program that has someone
come to the house once a week for two hours and work with Z.D. regarding her
problems.  








Both Graves and Gillinger
stated that they did not believe that Tamica would be able to adequately
provide for the emotional, physical, mental, and spiritual needs of Z.D. now or
in the future.  Gillinger pointed to
Tamica=s history of instability, lack of steady employment, different
housing, and long history of drug use to support her belief.  She further stated that although Tamica could
provide for Z.D.=s physical,
emotional, mental, and spiritual needs while she was at First Choice, she was
unsure whether Tamica would be able to adequately provide for Z.D. when they
left the program.  She was also concerned
that Tamica would return to using drugs when she left the program. She further
pointed to Tamica=s lack of
employment skills to suggest that she would return to her prior lifestyle.  

(3) The emotional and physical danger to Z.D. now and in the                    future.

 

Both Graves and Gillinger
testified that they believed that Tamica=s history of drug use and past Department history suggest that similar
issues would pose an emotional and physical danger to Z.D. now and in the
future.  See In re C.A.J., 122
S.W.3d 888, 893B94 (Tex.
App.CFort Worth 2003, no pet.) (noting that a parent=s continuous drug use poses an emotional and physical danger to a
child now and in the future).  On the
other hand, Tamica has completed parenting classes, life-skills courses, and
anger management classes.  Tamica has
made late progress in putting her drug use and prior lifestyle behind her.   

(4) The parental
abilities of the person seeking custody.








Tamica has not exhibited
exemplary or even passable parenting abilities in the past.  She has four other children but has raised
none of them.  Tamica testified that she
gave C.D. up for adoption to his godparents because she went to prison for the
offense of manufacture and delivery of a controlled substance. Additionally,
she stated that she decided that it was better for B.D. to live with the Flynns
because she was heavily involved in drugs. 
Tamica further stated that the Department removed A.W. and C.W. from her
care and placed them with relatives in Michigan.  

Further, Tamica has shown a
lack of interest in visiting Z.D.  Graves
testified that Tamica only visited Z.D. five times during the first five months
after Z.D. was removed.  On the other
hand, as stated above, Tamica has completed life-skills courses, parenting
classes, and anger management classes. Tamica testified that she is currently
taking a class to help her interact with Z.D. 
Additionally, Tamica has decorated a room at First Choice for Z.D. when
Z.D. comes to visit her.  

The history of drug use,
domestic instability, and unemployment support a finding that reunification
would not be in Z.D.=s best
interest.  By contrast, the Flynns, who
have been caring for Z.D., have been raising one of Tamica=s other children for seven years.  


(5) Programs available
to assist those seeking custody.

Our review of the record
finds no significant evidence related to this factor.

 

 

 

 








(6), (7) The plans for Z.D. of those seeking custody and the stability
                   of the home or proposed placement.

 

Mr. Flynn testified that he
and his wife would like to be named sole managing conservator of Z.D.  Additionally, Graves recommended that Tamica=s parental rights be terminated and that Z.D. be placed with the
Flynns.  She stated that the Flynns= home provides stability for Z.D. and that it is the only home that
Z.D. has known.  She also stated that the
Flynns and Z.D. have formed a strong bond and that the Flynns treat Z.D. like
their own child.  Graves stated that the
Flynns provide a safe and stable environment for Z.D. Additionally, Gillinger
stated that the Flynns have been able to provide Z.D. with Astructure and stability . . . in a loving environment.@  

(8) Acts or omissions of
the parent which may indicate that the                 existing parent-child relationship is not
a proper one. 

We have already detailed the
evidence that may indicate that the existing parent-child relationship between
Tamica and Z.D. is not a proper one.  The
evidence includes Tamica=s drug use
and domestic instability.  More than any
other evidence, this evidence weighs heavily in favor of a finding that
termination is in Z.D.=s best
interest.  However, there was evidence
presented during the trial that showed that Tamica has made significant, albeit
belated, changes and improvements in her life. 


 








(9) Any excuse for the
acts or omissions of the parent.

The record does not reflect
any excuses for Tamica=s acts or
omissons.

Considering all of the
evidence relevant to the Holley factors, including the evidence that
contradicts the trial court=s best interest finding, we hold that a fact-finder could rationally
have formed a firm belief or conviction that termination of Tamica=s parental rights as to Z.D. is in Z.D.=s best interest.  Accordingly,
we hold that the evidence is factually sufficient to support the trial court=s best-interest finding.  Thus,
we overrule Tamica=s third
issue. 

B. 
Ineffective Assistance of Counsel

In her fourth issue, Tamica
complains that she was denied the effective assistance of counsel after Z.D.=s removal and at trial. 
Specifically, Tamica contends that her attorney (1) failed to challenge
Z.D.=s removal based on a defective affidavit, (2) allowed a witness to
remain in the courtroom after the Rule had been invoked, (3) failed to impeach
a defense witness after his damaging testimony, and (4) failed to object to the
admission of hearsay evidence regarding the hair follicle testing.   

a.  Standard of Review








There is a right to effective
assistance of counsel in termination cases.  In re M.S., 115 S.W.3d 534, 544 (Tex.
2003).  To establish ineffective
assistance of counsel, appellant must show by a preponderance of the evidence
that her counsel=s
representation fell below the standard of prevailing professional norms and
that there is a reasonable probability that, but for counsel=s deficiency, the result of the trial would have been different.  Strickland v. Washington, 466 U.S.
668, 687, 104 S. Ct. 2052, 2064 (1984); Salinas v. State, 163 S.W.3d
734, 740 (Tex. Crim. App. 2005); Mallett v. State, 65 S.W.3d 59, 62B63 (Tex. Crim. App. 2001); Thompson v. State, 9 S.W.3d
808, 812 (Tex. Crim. App. 1999); see also In re S.L., 188 S.W.3d 388,
395 (Tex. App.CDallas 2006,
no pet.).








In evaluating the
effectiveness of counsel under the first prong, we look to the totality of the
representation and the particular circumstances of each case.  Thompson, 9 S.W.3d at 813.  The issue is whether counsel=s assistance was reasonable under all the circumstances and prevailing
professional norms at the time of the alleged error.  See Strickland, 466 U.S. at 688B89, 104 S. Ct. at 2065.  Review
of counsel=s
representation is highly deferential, and the reviewing court indulges a strong
presumption that counsel=s conduct
fell within a wide range of reasonable representation.  Salinas, 163 S.W.3d at 740; Mallett,
65 S.W.3d at 63.  A reviewing court will
rarely be in a position on direct appeal to fairly evaluate the merits of an
ineffective assistance claim.  Thompson,
9 S.W.3d at 813B14.  AIn the majority of cases, the record on direct appeal is undeveloped
and cannot adequately reflect the motives behind trial counsel=s actions.@  Salinas, 163 S.W.3d at 740 (quoting Mallett,
65 S.W.3d at 63).  To overcome the
presumption of reasonable professional assistance, Aany allegation of ineffectiveness must be firmly founded in the
record, and the record must affirmatively demonstrate the alleged
ineffectiveness.@  Id. (quoting Thompson, 9 S.W.3d
at 813).  It is not appropriate for an
appellate court to simply infer ineffective assistance based upon unclear
portions of the record.  Mata v. State,
226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

The second prong of Strickland
requires a showing that counsel=s errors were so serious that they deprived the defendant of a fair
trial, i.e., a trial whose result is reliable. 
Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.  In other words, appellant must show there is
a reasonable probability that, but for counsel=s unprofessional errors, the result of the proceeding would have been
different.  Id. at 694, 104 S. Ct.
at 2068.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome.  Id. 
The ultimate focus of our inquiry must be on the fundamental fairness of
the proceeding whose result is being challenged.  Id. at 697, 104 S. Ct. at 2070.

b.  Analysis








Tamica first complains that her attorney was ineffective because he
did not challenge the removal of Z.D. based on a defective affidavit.  Tamica argues that the affidavit prepared by
Andrea Jennings, a Department specialist, was not based on personal knowledge
as required under the section 262.104 of the family code.  See Tex. Fam. Code Ann. ' 262.104
(Vernon Supp. 2008).  

Tamica argues that her
attorney should have objected to the affidavit because it was not based on
personal knowledge but, instead, simply Arehashed@ allegations
of the Department=s history of
Tamica.  However, there is no evidence in
the record to establish why Tamica=s counsel did not object to the alleged defective affidavit.  Where the record is silent, it is
impermissible for us to speculate that trial counsel=s performance was deficient.  See
Tong v. State, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000) (holding that Awithout some explanation as to why counsel acted as he did, we presume
that his actions were the product of an overall strategic design@), cert. denied, 532 U.S. 1053 (2001); Jackson v. State,
877 S.W.2d 768, 771 (Tex. Crim. App. 1994). 
Instead, we presume that trial counsel acted out of sound trial
strategy.  Tong, 25 S.W.3d at
714.  Thus, Tamica has failed to
establish that her counsel=s actions were deficient. 
Additionally, Tamica has failed to prove prejudice, a requisite under Strickland.  See Strickland, 466 U.S. at 694, 104
S. Ct. at 2068.  We hold that Tamica has
not proven that her attorney was ineffective because she has not shown that her
attorney was deficient or that she was prejudiced by her attorney=s alleged deficient performance. 








Tamica also contends that her
attorney was ineffective because he allowed Mr. Flynn to remain in the
courtroom after the Rule had been invoked. See Tex. R. Evid. 614.  Rule 614 of the Texas Rules of Evidence
provides in relevant part that A[a]t the request of either party the court shall order witnesses
excluded so that they cannot hear the testimony of other witnesses, and it may
make the order of its own motion.@  Id.  The policy behind the Rule is to minimize
Awitnesses= tailoring
their testimony in response to that of other witnesses and prevent[ing]
collusion among witnesses testifying for the same side.@  In re K.M.B., 91 S.W.3d 18, 28 (Tex. App.CFort Worth 2002, no pet.) (citing Drilex Sys., Inc. v. Flores,
1 S.W.3d 112, 116 (Tex.1999)).  

After the Rule had been
invoked, the prosecutor stated that, A[Mr. Flynn] is one of the custodians of the child at this time.  We would ask that he be allowed to remain in
the courtroom.@  The trial court then asked if there were any
objections to Mr. Flynn being allowed to remain in the courtroom, and Tamica=s attorney stated that he did not object.   








Tamica cannot show that her
attorney was deficient.  Tamica makes
conclusory statements that her attorney did not adequately review the Flynns= home study.  However, there is
no evidence in the record explaining trial counsel=s reasons for allowing Mr. Flynn to remain in the courtroom.  Again, when the record is silent as to
counsel=s reasons, we presume that trial counsel acted out of sound trial
strategy.  Tong, 25 S.W.3d at
714.  Thus, Tamica has failed to show how
her attorney was deficient.  

Additionally, Tamica has
failed to establish prejudice.  Tamica
simply states that Mr. Flynn=s testimony should have been elicited at the December 29, 2006 show
cause hearing, but fails to allege how the outcome of the trial would have been
different if her attorney had required Mr. Flynn to remain outside the
courtroom during Graves=s and
Gillinger=s
testimony.  See Strickland, 466
U.S. at 694, 104 S. Ct. at 2068. Thus, Tamica cannot satisfy the Strickland test
because she cannot show how her attorney was deficient or how she was
prejudiced by her attorney=s alleged deficient conduct.  

Tamica next argues that her
attorney was ineffective because he did not impeach Mr. Flynn after his
damaging testimony.  Once again, there is
no evidence in the record regarding trial counsel=s reasons for not impeaching Mr. Flynn.  As stated above, because the record is silent
as to trial counsel=s reasons,
we presume that trial counsel acted out of sound trial strategy.  See Tong, 25 S.W.3d at 714.  Further, Tamica has failed to show how the
outcome of the trial would have been different but for her attorney=s alleged deficient performance. 
See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  Thus, Tamica has not satisfied either prong
of the Strickland test.  








Finally, Tamica argues that
her attorney was ineffective because he did not object to the admission of
hearsay evidence regarding the hair-follicle tests. Specifically, she complains
that her trial attorney has a Adeficient understanding of the Rules of Evidence.@  At trial, evidence of the
hair-follicle tests were introduced during Gillinger=s testimony.  However, there is
no evidence in the record as to why Tamica=s attorney did not object to the admission of the hair-follicle tests,
so we must presume that it was the result of sound trial strategy.  See Tong, 25 S.W.3d at 714.
Additionally, before the results of the tests were introduced at trial, Tamica
testified that she had tested positive for cocaine and ecstasy in July
2007.  As such, Tamica cannot show that
her attorney was deficient.  Furthermore,
Tamica has failed to allege how the outcome of the trial would have been
different if her attorney had objected, a requisite of the Strickland test.  Thus, Tamica cannot show that her attorney
was ineffective.  Because Tamica has
failed to satisfy the Strickland test for any of her ineffective
assistance claims, we overrule her fourth issue.  

 

 

 

 

 








Conclusion

Having overruled Tamica=s four issues, we affirm the trial court=s termination order. 

 

ANNE GARDNER

JUSTICE

 

PANEL:      GARDNER, WALKER, and MCCOY, JJ.

 

DELIVERED:  September 25, 2008











[1]See Tex.
R. App. P. 47.4.





[2]Tamica
was on probation for assault.